No. 2--06--0235          Filed: 11-20-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re MARRIAGE OF | ) | Appeal from the Circuit Court |
| STEVEN L. BLUM, | ) | of Lake County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 98--D--409 |
| | ) | |
| JUDY KOSTER, | ) | Honorable |
| | ) | Joseph R. Waldeck, |
| Respondent-Appellant. | ) | Judge, Presiding. |

Modified Upon Denial of Rehearing

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

The respondent, Judy Koster, appeals from the trial court's orders modifying the maintenance she receives from the petitioner, Steven Blum, and dismissing her petition for contribution to attorney fees. In addition, Judy asks us to reconsider our decision in In re Marriage of Konchar, 312 Ill. App. 3d 441 (2000). For the following reasons, we reverse and remand.

BACKGROUND

Judy and Steven were married on September 13, 1982. They had two sons: Eliot (born in 1984) and Theodore (born in 1986). Steven also had a son, Josh, from his first marriage, who lived with the family for several years. On February 25, 1998, Steven filed a petition for dissolution. On April 6, 2000, the trial court entered a judgment for dissolution that incorporated a marital settlement agreement (MSA).

The judgment granted Judy sole custody of the parties' children, who were 15 and 13 years old at the time. In the MSA, the parties also agreed that Judy would receive unallocated maintenance and support as follows:

"Judy shall receive as the unallocated maintenance and support for her and the minor children, commencing April 1, 2000, the sum of Five Thousand Dollars ($5,000.00) per month for a total of sixty-one (61) consecutive months. Judy's right to receive maintenance and Steven's obligation to pay maintenance after April 30, 2005 is reviewable. Maintenance shall not terminate without a court order. This award is based on Steven's gross monthly income of Thirteen Thousand Three Hundred Thirty Three Dollars and thirty three cents ($13,333.33) and the fact that Judy is presently unemployed. In addition to the aforesaid, Judy shall also receive thirty eight and one-half percent (38 ½%) of the gross amount of any bonus received by Steven during this time frame. In addition, $3,600.00 per year shall be paid by Steven to Judy from these bonus checks for the first 24 months of said bonus payments at the rate of an additional $1,200.00 in addition to her percentage for each bonus payment. Each payment shall be made at the time Steven receives his bonus check, but the total must be paid on or before December 31st of each year. The total amount of these additional payments is $7,200.00. Said monthly payments and percentage of Steven's bonus will continue until the first to occur of the following events:

A. The death of Judy Koster[;]

B. The remarriage of Judy Koster;

C. Judy Koster's cohabitation with an adult male on a resident continuing conjugal basis;

D. The death of Steven Blum;

E. The change of custody of one or more of the minor children;

F. Upon a showing of substantial change in circumstances which shall not include the attainment of majority or other emancipatory event of one or more of the minor children."

Within the same section of the MSA, the parties agreed that Judy had a duty to make reasonable efforts to become economically self-sufficient "during said period." At the proveup of the dissolution, Steven testified that he understood the above maintenance provisions to mean that he would pay maintenance to Judy until April 30, 2005, after which maintenance would be reviewable by the court. Judy testified similarly, as follows:

"Q. You understand that in the review provisions that if the maintenance is still continuing, if it hasn't been terminated for a reason that's set forth in this Agreement, that Steven's obligation to pay maintenance after April 30, 2005, and your right to receive it after that date is reviewable by the Court?

A. Yes, I understand that."

Both parties testified that they were familiar with all of the various provisions of the MSA and understood them.

In 2002 and 2003, the parties both filed petitions relating to college expenses, and Steven filed a petition to reduce maintenance. Thereafter, on May 28, 2003, the parties entered into an agreed order (Agreed Order) providing that Steven would pay for the children's college expenses and that Judy would pay for their travel to and from college and certain other incidental expenses. In addition, the agreement identified income of Steven's that was "described as a 'other' on his employment records" and made provisions for the allocation of this income. Steven retained the "other income"

for 2000 through 2002 in return for his payment of Judy's attorney fees, and was required to pay Judy 25% of the gross amount of the "other income" in 2003 and thereafter. The parties specified that the agreement regarding the "other income" in no way modified the provisions of the MSA regarding maintenance and support, but instead imposed new, "additional maintenance payments."

On January 3, 2005, Steven filed a petition seeking among other things to terminate maintenance after April 30, 2005, pursuant to the MSA's provision that the unallocated maintenance and support payments would be reviewable after that date. Steven argued that his obligation to pay maintenance should be terminated because the children had attained their majority, he was paying their college expenses in the amount of $55,000 per year, Judy's living expenses were lower because she had moved into a smaller home, and Judy was a licensed attorney who could support herself and had an obligation under the MSA to do so. In response, Judy denied that the majority of the unallocated payments had been child support and pointed out that the children's attainment of majority had been expressly excluded as a ground to modify the payments under the MSA. She also denied that Steven's personal contribution to the children's college expenses was as high as he claimed, because maritally funded accounts had been created for those expenses earlier. Judy denied that she was able to support herself and contended that Steven had failed to show any substantial change in circumstances as required under the MSA and section 510(a--5) of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/510(a--5) (West 2004)) in order to modify or terminate maintenance. Judy combined her response with a counterpetition, in which she sought an accounting of the distribution of the maritally funded accounts for the children's educational expenses.

Prior to the trial of the matter, Steven moved to reset Judy's maintenance temporarily, for the period between April 30, 2005, and the trial date. On May 25, 2005, the trial court granted this motion and reduced Judy's maintenance to $3,000 per month. On June 28, 2005, the trial court modified the interim maintenance to $5,000 per month. On August 11, 2005, the trial court again reduced the interim maintenance to $3,000 per month, but maintained Steven's obligation to pay 38.5% of his bonuses pursuant to the MSA, plus the additional maintenance provided for in the Agreed Order. In addition, the trial court awarded Judy $10,000 in interim attorney fees prior to trial.

Trial commenced on August 9, 2005, and continued intermittently for seven days, culminating on October 25, 2005. At the close of Steven's case, Judy filed a motion for a directed finding, in which she argued that Steven had failed to carry his burden of proving that there had been a substantial change in circumstances sufficient to warrant modifying the judgment for dissolution. Steven argued that he bore no such burden of proof, citing In re Marriage of Golden, 358 Ill. App. 3d 464 (2005), for the proposition that a "review" of maintenance differs from a proceeding to modify maintenance and in a review neither party must prove a substantial change in circumstances. Relying on Golden, the trial court denied the motion for a directed finding.

The evidence presented at trial established the following facts. Judy was born in 1949, and graduated from the University of Illinois with a bachelor's degree in French and English literature. She obtained a master's degree in teaching in 1972, but never taught except for her student teaching. She worked as an editor for about two years. She began taking night classes at law school in 1975. During law school she worked briefly for a personal injury lawyer and then began work at Foos, Meyers & Jacobs. After she graduated and passed the February 1978 bar exam, she became an associate at the same firm for approximately one year, writing briefs and doing whatever tasks were

assigned her. After leaving that firm, she was hired by a company called Franchise Concepts, which assisted franchisees across the country with registration, contracts, and other legal work. Judy testified that she was not familiar with franchise law and procedures and relied on others with more expertise. Judy then opened her own law practice in Chicago, which she maintained for about a year and a half, handling a variety of small cases.

Judy and Steven married in September 1982. At the time, Steven had just completed his residency in anesthesiology and was living in California. Judy wound up her law practice and joined him in California in October 1982. The parties' sons Eliot and Teddy were born in 1984 and 1986. In addition, Steven's son Josh from his first marriage lived with them for several years.

Judy passed the California bar exam and did occasional legal work for one client, but did not have an active legal career. Steven was on call on a regular basis and was very busy with work. At one point while Josh was living with them and after Eliot was born, Judy was involved in a case that demanded most of her time for 10 days, and she saw that her absence during that time had a visibly negative impact on the family. After that she dedicated herself to the family. Judy served as the homemaker, raising the children and maintaining a kosher home. She assisted with the boys' education, religious upbringing, and extracurricular activities. She planned the family vacations and entertained guests frequently.

Steven's career prospered, and in 1987 the parties purchased a $600,000, six-bedroom house, which they renovated at a cost of over $50,000. The family maintained a high standard of living, employing household help and taking vacations including a cruise. In 1993 the family relocated to Illinois. Steven's pay was slightly lower, and they bought a five-bedroom house in Highland Park for $475,000. The house was large and had a swimming pool and spa. Josh continued to live with the

family in Illinois. Judy continued to raise the children and manage the home. Despite Steven's drop in income, the family still enjoyed a high standard of living. In 1998, Steven's total income was $261,522, and the family's living expenses were approximately $18,000 per month.

Steven moved out in 1998 and filed for divorce. Financial statements filed by the parties show that in 1999, after Steven had moved out, the monthly living expenses for Judy and the boys totaled $14,285 per month. In April 2000 the judgment for dissolution of marriage was entered. Judy began receiving unallocated support of $5,000 per month plus a share of Steven's bonuses, for a total income of approximately $94,843 in 2000. Steven was awarded the home he had purchased, and Judy was awarded the marital home. Each party was solely responsible for the debt on his or her residence. Each party kept one car. The parties transferred monies between their individual retirement accounts (IRAs) according to the MSA, with the final balance in each IRA being over $1 million.

The boys, who were 14 and 16 in 2000, continued to live primarily with Judy, although they visited with their father regularly. Steven's visitation was structured around his work schedule: each month when he got his schedule he would inform Judy, and the parties would arrange visitation that coordinated with his schedule. The times that the boys were out of the house thus varied from month to month. When the boys were at home with Judy, she continued to cook meals and maintain the home for them, and to assist them with their education and extracurricular activities. In 2002, Eliot began attending college. Teddy started college in the fall of 2004. The boys still live at Judy's home approximately 4½ months per year.

Steven's maintenance payments to Judy increased (as a result of increases in his yearly bonuses) from $94,843 in 2000 (about $7,904 per month) to $103,335 in 2004 (about $8,611 per

month). Judy paid income taxes on the payments she received. Judy testified that since the divorce she regularly experienced a shortfall between the household living expenses and the monthly income she received. She would go into debt to pay for expenses as they arose and then pay off the debt when she received her share of the periodic bonus payments from Steven. She also paid down debt whenever she refinanced the house, although she testified that her primary goal for the refinances was not debt-related. Judy moved into a smaller, three-bedroom home in 2003. Prior to moving, she had home maintenance expenses related to storm damage from a microburst, replacement of the swimming pool heater, the fence around the pool and property, replacement of two air conditioning condensers, and painting and repairs to prepare the house for sale. After moving, Judy made repairs to the new home as well. She testified that the net profit from the sale of her former home went into the cost of the new home, moving, and repairs. Judy has not withdrawn any funds from her IRA, which has decreased in value due to a decline in the stock market. Her monthly household expenses at the time of trial were $7,964.

Steven's income has increased since the divorce, growing from $281,626 in 2000 to $330,520 in 2004. He pays for almost all of the boys' college expenses, which totaled $62,433 between June 2004 and June 2005. The support payments that he made to Judy were deductible from his taxable income. Steven stipulated that he has the ability to pay maintenance to Judy.

After the divorce, Judy sought to develop a practice in immigration law. She joined professional associations of immigration lawyers, attended classes and seminars, and bought books and other materials related to work in that field. Between 2000 and 2004, she represented eight or nine clients in immigration matters. She also worked independently for other attorneys, writing briefs, reviewing contracts, handling discovery, and doing other "scut work."

From 2000 to 2005, Judy maintained an office in downtown Chicago and worked there approximately two days per week, fitting her work schedule around the children's school schedule and their visits with Steven. In addition, she often worked on legal matters from a home office several hours a week. In 2000, Judy grossed $6,541 from her law practice; in 2001, she grossed $20,309; and in 2002, she grossed approximately $15,470. Her income was much lower in 2003, when she grossed $3,060, and in 2004, when she grossed only $1,455. At no time, however, did Judy ever earn a profit; even in 2001 and 2002, expenses consumed her gross earnings. Near the end of 2003, Judy was approached by a woman who admired a necklace Judy had made and asked if Judy would make some additional jewelry for a trunk show. Judy agreed and spent time and money on making jewelry in the hope of supplementing her income, but was unsuccessful. Judy testified that she continued to work the same number of hours at her law practice and worked on her jewelry at night. Judy discontinued her jewelry making at the end of 2004.

In May 2005 Judy closed her downtown office and opened a small office in Northbrook, which she shares with Renee Bass, an established immigration lawyer. Judy currently works about 30 to 35 hours per week. She assists Ms. Bass with cases and receives referrals from Sharon Greenspan, another experienced immigration lawyer. Her monthly business expenses are approximately $1,100, and she had one-time start-up costs for equipment and furniture of approximately $850. She has had five new clients since moving her office.

Judy testified that she also regularly applied for law jobs, approximately 10 to 12 jobs per month throughout the period from 2000 to the present. She had no documentary evidence of those attempts and testified that most of the applications were on-line and generated no record. She

testified in some detail about four or five jobs that she applied for recently. She never received an interview from any of these applications.

Grace Gianforte testified as a vocational expert for Steven. She serves as a vocational expert witness at Social Security hearings, and also does vocational and mental health counseling. She interviewed Judy for an hour and a half in 1999, prior to the divorce, regarding Judy's career goals and skills. When she was contacted in 2005 to produce an updated opinion of Judy's employment efforts and prospects, she received a resume of Judy's that was almost identical to the one she had received in 1999 and had no new information on it. She did not re-interview Judy prior to preparing her new report. In 1999, she recommended that Judy follow up on her interest in immigration law by becoming involved in professional associations for attorneys, attending seminars, and networking with other attorneys. These were reasonable steps to take to establish an immigration law practice. Judy took all of these steps.

Ms. Gianforte testified that she viewed Judy's age (51 at the time of the divorce, and 56 at the time of the trial on maintenance) as a neutral factor in her employability, neither positive nor negative. Based on occupational statistics, she estimated that there are 952 openings for lawyers in the Chicago area. The median earnings for lawyers in this area were $65,000 in 2005, and she believed that Judy could earn this much.

Arlene Hirsch testified as a vocational expert for Judy. She is licensed by the State of Illinois as a clinical professional counselor and as a professional counselor. She has done career counseling since 1983, and also does psychological counseling. Ten to fifteen percent of the clients in her career-counseling practice are attorneys. In 2003 and 2004, she contracted with John Marshall law school to provide career counseling to students and alumni who were coming back into the legal field after

an absence. During that same time, she served as the co-chair of the Careers Committee of the Young Leadership Division of the Chicago Bar Association. She has counseled attorneys who are 50 years old or older. One recent example was a woman who was a partner in a labor law firm and who had worked continuously in the legal field for 25 years, although part-time for some of that. She wished to work outside of a firm, and she was able to find an academic job after searching for more than a year. Another older woman client went to law school after having been an anesthesiologist and specialized in health care law, but could not find a full-time job after graduating. She eventually found a contractual position with Abbott after about 18 months. A third woman went to law school when she was in her fifties but could not get hired as an associate in a firm when she graduated. That woman eventually took a part-time paralegal position in the suburbs. Based on her experience in her counseling practice, Ms. Hirsch opined that lawyers who are older than 50 and seeking to be hired are expected to have extensive legal experience and a book of business. The inability to meet these expectations would not make finding a job impossible, but would present a lot of obstacles.

Ms. Hirsch met with Judy twice during the summer of 2005. She interviewed Judy regarding her work history, her professional goals, and her attempts since her divorce to find a legal job or build a law practice. Ms. Hirsch reviewed job listings Judy had responded to, application letters, and publications Judy was using to update her skills. Judy's legal work during her marriage was minimal (less than five hours per week), she had no recent experience in franchise law, and the job market had changed substantially since Judy first practiced law regularly 25 years ago. Ms. Hirsch viewed Judy as not having developed any legal specialty before her divorce in 2000, and found it difficult to compare her experience even to that of a first- or second-year associate. There was a discrepancy between the jobs that Judy was applying for and her experience; they would be a stretch for her, and

she would not look like the best candidate. Based on Judy's level of experience and lack of a specialty, she was not a good candidate for a recruiter or headhunter.

Judy's efforts to develop her own practice were hampered by her lack of experience in immigration law, for which she would need a mentor to assist her; her need to learn from scratch how to run a business, including developing her computer skills; and undercapitalization, because she said that she could not afford malpractice insurance. Judy's goal of building an immigration practice recently became more appropriate when she acquired a mentor and a source of referrals. Judy's facility with languages and emotional connection to the plight of immigrants make her a good match for immigration law.

Ms. Hirsch criticized Ms. Gianforte's 2005 report and assessment of Judy on several grounds. First, Ms. Gianforte did not consider important information about Judy's work experience and efforts since 1999, because she reviewed the same resume that she reviewed in 1999 and did not seek to meet with Judy again to supplement the information on the resume. Second, Ms. Gianforte's reliance on quantitative data from the Department of Labor was misplaced in this context, as these general statistics are not really relevant to the situation of a 56-year-old woman, such as Judy, who is reentering the job market after many years and lacks an area of expertise. Ms. Hirsch opined that Ms. Gianforte "underestimated or perhaps was in denial about" the degree of bias against older applicants that exists throughout the legal profession. Ms. Gianforte's suggestion that Judy might be able to find work in the governmental or nonprofit sectors if she cannot find work in the private sector reflects an incorrect assumption that the governmental and nonprofit sectors are not competitive or that age bias does not exist there. Finally, Ms. Hirsch noted an internal contradiction in Ms. Gianforte's report, which acknowledged that Judy's legal work during her marriage was sporadic and produced

"inconsequential" income, but then assessed Judy's employability as if she had 26 years of experience. Ms. Hirsch agreed with Ms. Gianforte's recommendations but believed that they would not be sufficient to result in a successful law practice or employment without mentoring.

As to the reasonableness of Judy's efforts to find or develop professional work, Ms. Hirsch believed that Judy had been taking appropriate steps and "trying really hard" to develop a law practice since the date of the divorce, but she faced a steep learning curve in a number of areas and was unlikely to succeed in her efforts without a mentor. Now that Judy had acquired a mentor and a source of referrals, Ms. Hirsch believed she had a better chance of succeeding.

Sharon Greenspan, an immigration lawyer, testified that she had approximately 25 years of experience in immigration law, but that illness had prevented her from maintaining a full-time practice for the last several years. She has more potential clients contacting her than she can serve, and for some time she has referred some of her clients to Renee Bass, another immigration lawyer. She has known Judy since law school. Early in 2005, she brought together Ms. Bass, who wished to relocate from her downtown office and was seeking someone to share space with in the suburbs, and Judy, who was seeking someone to share space with who could also advise her in her immigration practice. They now have all three attorneys' names on the office door, although Ms. Greenspan does not participate in the physical work such as filing documents. Ms. Greenspan has referred four or five cases to Judy and Ms. Bass since they opened their office together and has worked with them on two of those cases. Judy is a hard worker and her clients have been satisfied.

Renee Bass testified, describing the law office she shares with Judy and their work on cases. She has practiced immigration law for approximately 27 years, and believes that it has become more difficult to serve clients' needs because of additional restrictions on immigration that were enacted

since September 11, 2001. In addition, it has become a more competitive area because there are many more immigration lawyers now. Both Ms. Bass and Ms. Greenspan testified that it is essential for a new immigration lawyer to have a mentor to become successful.

Judy's final witness was William Browers, a lawyer who worked for 20 years at the State's Attorneys Appellate Prosecutor's office and rose to the position of deputy director there, and then served for another five years as chief of the criminal appeals division of the Illinois Attorney General's office. He took early retirement in 2002 at the age of 52½. After eight months in a new position, he sought other employment. Despite seeking work for over two years, he was never able even to get an interview. The trial court limited his testimony, finding that he was not similar enough to Judy in terms of experience or specialty to be probative on the issue of the legal job market.

The trial court announced its decision on October 25, 2005. It first construed the language of the MSA, determining that the MSA provided that maintenance would be reviewable after 61 months, and held that the instant proceeding was a review. Because it was a review and not a modification proceeding, Steven did not have any burden to prove a substantial change in circumstances. Instead, the trial court found that the parties had contemplated a general review, and singled out Judy's obligation to make reasonable efforts to become economically self-sufficient as "an issue to be considered on review." The trial court then conducted a redetermination of maintenance pursuant to section 510(a--5) of the Act (750 ILCS 5/510(a--5) (West 2004)), which requires the court to consider eight factors enumerated in that section in addition to the factors listed in section 504(a) of the Act (750 ILCS 5/504(a) (West 2004)).

The trial court specifically discussed and made factual findings regarding each of the eight factors under section 510(a--5). As to the first factor, change in the parties' employment status, the

trial court found that there had been no change. The second factor was the efforts made by the party receiving maintenance to become self-supporting. The trial court found that Judy's efforts were "minimal" and characterized her efforts as attending a few seminars and only recently establishing a law office conducting a "less than part-time practice." In considering the third factor, impairment to the present and future earning capacity of the parties, the trial court stated that the only impairment of Judy's earning capacity was self-imposed. The trial court stated that it did not consider the fourth factor, the tax consequences of the maintenance payments on the economic circumstances of each party. The trial court stated that it did consider the five-year duration of the maintenance payments relative to the 18-year length of the marriage, although it did not state how this factor affected its decision. The sixth factor was the property including retirement benefits awarded to each party at dissolution and the status of that property today. The trial court noted that each party received over $1.3 million in assets at the time of dissolution, and that although Judy's IRA had decreased in value her combined assets still totaled over $1 million. With respect to the seventh factor, the increase or decrease in each party's income since dissolution, the trial court found that Steven's income had increased and that Judy's income had not changed, commenting that it interpreted this factor in light of "a condition imposed on Judy to become self-sufficient." Regarding the eighth factor under section 510(a--5) of the Act, the property acquired after the divorce and currently owned by each party, the trial court stated (apparently referring incorrectly to the distribution of property at dissolution): "Again, the parties had an equal division of the assets."

The trial court recited that it also took into account all of the factors enumerated in section 504(a) of the Act, such as the needs of each party, the present and future earning capacity of each

party, and the standard of living established during the marriage, although it did not state how any of these factors influenced its ultimate determination. The trial court summed up its decision thus:

"THE COURT: [I am] taking into account *** the express agreement of the parties that Judy had a duty and affirmative obligation [on] her part to make reasonable efforts to become economically self-sufficient during the past five years.

Given that these minimal at best efforts have failed, and given that the original order of unallocated maintenance and support was for Judy and two minor children, both of whom are emancipated today, it is this Court's order that the maintenance obligation of Steven having been reviewed by this Court shall continue for a period of three more years at a rate of $3,500 per month at which time said maintenance shall terminate. That's the Court's order."

On November 2, 2005, the trial court entered an order reflecting this disposition. The order provided, among other things:

"2. That the Petitioner, STEVEN BLUM shall pay to the Respondent, JUDY KOSTER, the sum of Three thousand Five hundred dollars ($3,500.00) per month commencing on the 30th day of May, 2005, and continuing on the 30th day of each month thereafter until a total of thirty-six (36) monthly payments of the aforesaid amount are made. This is in full and complete satisfaction of STEVEN BLUM's obligation to pay maintenance to JUDY KOSTER and other than the aforesaid payments, she shall be forever barred from seeking maintenance from the Petitioner. This Order is non-modifiable as to duration and amount and can not [sic] be changed if there is a change in circumstances nor is it subject to any review by this Court.

* * *

7. JUDY KOSTER shall be entitled to receive in addition to the maintenance set forth in paragraph 2 above, 38.5% of 4/12ths of STEVEN BLUM's year end bonus for 2005 only. This amount of additional maintenance is ordered to comply with the prior maintenance orders of this Court. This is the only additional maintenance to be paid by STEVEN BLUM other than the amounts set forth in paragraph 2 above."

The trial court's order thus modified Steven's maintenance obligations under both the MSA and the Agreed Order, reducing his monthly payments to Judy from approximately $8,600 per month (averaged across the year to include bonuses) to $3,500 per month.

Within 30 days of the trial court's order, Judy filed a motion for reconsideration combined with a petition for contribution to attorney fees. She included in her motion a request that the trial court reduce or eliminate her obligations under the Agreed Order, as she was no longer receiving any income under that order and could no longer afford to pay the designated expenses for the boys. Steven moved to dismiss the petition for contribution on the ground that it was untimely under In re Marriage of Konchar, 312 Ill. App. 3d 441 (2000). The trial court denied Judy's motion for reconsideration and granted Steven's motion to dismiss the contribution petition. Judy filed a timely notice of appeal.

ANALYSIS

Judy raises two arguments on appeal: that the trial court erred in reducing her maintenance and making it nonmodifiable, and that the trial court erred in dismissing her contribution petition. We consider each argument in turn.

I. Review of Maintenance

-17-

Judy first contends that the trial court erred as a matter of law in its interpretation of the MSA as contemplating a general review of maintenance after 61 months. In our recent decision in In re Marriage of Golden, 358 Ill. App. 3d 464, 472 (2005), we held that in a general review, unlike a proceeding for modification or termination of maintenance, the moving party does not bear the burden of proving a substantial change in circumstances. The trial court relied on Golden in determining that Steven bore no such burden of proof. Judy argues that this determination was erroneous and that both during and after the 61-month period set out in the MSA, Steven was required to show a substantial change in circumstances before maintenance could be modified. Steven responds that interpreting the MSA as Judy suggests would effectively eliminate from the contract the provision that "Judy's right to receive maintenance and Steven's obligation to pay maintenance after April 30, 2005 [the expiration of the 61 months] is reviewable."

A marital settlement agreement is construed as if it were a contract, and the court should seek to effectuate the parties' intent. In re Marriage of Carrier, 332 Ill. App. 3d 654, 658 (2002). Ordinarily, the best guide to the parties' intent is the language they used. "The trial court should consider parol evidence to decide what the parties intended only when the language contained in the settlement agreement is ambiguous." Carrier, 332 Ill. App. 3d at 658, citing In re Marriage of Wenc, 294 Ill. App. 3d 239, 243 (1998). The interpretation of a marital settlement agreement is a question of law (Carrier, 332 Ill. App. 3d at 658), which we review de novo.

After reviewing the MSA carefully, we conclude that we must reject the interpretation advanced by Judy, as it would indeed eliminate the 61-month period from the contract. "Generally, we will not assume that the parties inserted key contractual language for no reason at all, as a document should be read to give effect to all its provisions." Wenc, 294 Ill. App. 3d at 247. The

MSA, while not a model of unambiguous drafting, clearly provides that: (1) Judy would receive unallocated support and maintenance of $5,000 per month (plus a percentage of Steven's various bonuses) for 61 months; (2) after the end of that period, maintenance would be reviewable; and (3) the monthly payments and share of bonuses would continue until the occurrence of one of six specified events. Judy seeks to read these provisions to mean that the 61-month period is irrelevant, and that either during or after this period maintenance could not be modified unless one of the six factors were shown. We cannot accept this interpretation, as it makes the parties' identification of the 61-month period meaningless. The plain language of the MSA indicates that the parties intended that the structure under which maintenance was paid would change in some way after the 61 months, or else they would not have deliberately established such a period. In addition, the parties' testimony at the proveup of the dissolution reflects that both parties understood the maintenance provision of the MSA to mean that Steven would pay maintenance until April 30, 2005, after which maintenance would be reviewable. Because we cannot agree with Judy's contrary interpretation of the MSA, we find that the trial court did not err in rejecting this interpretation.

Judy contends that, even if the trial court did not err as a matter of law in construing the MSA as it did, its reduction of her maintenance was an abuse of discretion, based on the evidence adduced at trial. In reviewing issues of maintenance, a trial court is to consider the 12 factors set forth in section 504(a) of the Act (750 ILCS 5/504(a) (West 2004)) as well as the 8 factors set forth in section 510(a--5) of the Act (750 ILCS 5/510(a--5) (West 2004)). We review the propriety of a maintenance award for an abuse of discretion. In re Marriage of Connors, 303 Ill. App. 3d 219, 230 (1999).

In this case, it is clear that the trial court focused primarily on Judy's efforts to become economically self-sufficient, and the issue of whether those efforts were "reasonable" as required by the MSA. Although the trial court did not find that Judy's efforts were not reasonable, the court's comments show that it viewed Judy's efforts negatively, describing Judy's 25-to-30-hour-per-week schedule as "less than part-time" and her efforts overall as "minimal at best." It is unclear on what evidence the trial court based these descriptions. Both vocational experts testified that, in their opinions, Judy was taking reasonable steps to launch her immigration law practice. Ms. Hirsch testified that Judy's practice was not successful in the first few years because she did not have a mentor at that time, an opinion that was corroborated by two experienced immigration attorneys who testified that having a mentor is essential to establishing an immigration practice. In addition, there was evidence regarding the obstacles Judy faced in finding legal employment without substantial experience in any specialty and with an 18-year gap since her last regular employment. Judy testified that she curtailed her law practice early in her marriage in order to support her family and raise the children, including a child of Steven's prior marriage. In light of this testimony, we are hard pressed to find a basis for the trial court's conclusion that "[t]he only impairment of Judy's earning capacity is *** self-imposed."

"[I]n determining the amount of maintenance to grant ***, the trial court should keep in mind the reasonable needs of [the party receiving maintenance] in light of the standard of living established during the marriage." (Emphasis in original.) In re Marriage of Brackett, 309 Ill. App. 3d 329, 342 (1999). Although the trial court recited that it had considered the factors enumerated in section 504(a) of the Act, including the needs of each party, the present and future earning capacity of each party and any impairment to that capacity due to the devotion of time to domestic duties, the standard

of living established during the marriage, and the age and physical and emotional condition of each party, its findings do not reflect any consideration of these factors.

The record reveals that Judy's standard of living has declined substantially since the dissolution. During the marriage the family lived in large houses with paid help and spent $18,000 per month on their needs and wants. Judy now has household living expenses of a little less than $8,000 per month, which include providing a home for the boys for 4½ months each year and paying some of their expenses. Since the dissolution she has moved into a smaller home with high home-maintenance costs. The bulk of the over $1 million in assets is held in her IRA and her home, neither of which is a liquid asset available for daily living expenses. By contrast, Steven's assets and income have increased, even taking into account the sums he is expending for the boys' college educations. Steven stipulated without limitation that he is able to pay maintenance. "The dependent former spouse is entitled to continue to live in some approximation to the standard of living established during the marriage unless the payor spouse's financial situation, the duration of the marriage, or other factors indicate otherwise." Connors, 303 Ill. App. 3d at 229. The evidence showed that even at the former level of maintenance, Judy's standard of living was below that of the marriage. Accordingly, we find that the trial court abused its discretion in reducing Judy's maintenance from a total of approximately $8,600 per month to $3,500 per month. We remand for a new determination of an appropriate maintenance award, retroactive to May 1, 2005, that takes into account the principles discussed herein.

Because we are remanding this case for a new determination of an appropriate maintenance award, we need not reach the remainder of the issues Judy raises regarding the issue of maintenance. There is one issue, however, on which we find it necessary to comment: that aspect of the trial court's

order limiting Judy's maintenance to three years and stating that the award was "non-modifiable as to duration and amount and can not [sic] be changed if there is a change in circumstances nor is it subject to any review by this Court." Judy contends that this aspect of the order was contrary to law, and we agree. Counsel has not cited, nor can we locate, any authority permitting a court sua sponte to make an award of periodic maintenance nonmodifiable. Pursuant to section 502(f) of the Act (750 ILCS 5/502(f) (West 2004)), the parties to a marital settlement agreement may agree to make maintenance nonmodifiable and nonreviewable. In re Marriage of Kozloff, 101 Ill. 2d 526, 533-34 (1984). However, in the absence of an agreement, no provision of the Act permits a court to impose those terms upon the parties to a dissolution. Rather, pursuant to section 510(a--5) of the Act, all awards of periodic maintenance are modifiable or reviewable. See 750 ILCS 510(a--5) (West 2004); In re Marriage of Selinger, 351 Ill. App. 3d 611, 617 (2004). Indeed, a trial court may modify a maintenance order even if the order does not expressly state that a court may review it, so long as the court finds modification to be appropriate and a petition to modify is filed within the period of maintenance ordered. Selinger, 351 Ill. App. 3d at 618. As the trial court here lacked any statutory authority to impose nonmodifiable maintenance on the parties outside of an agreement, its attempt to make Judy's maintenance terminate permanently after 36 months is ineffective and does not bar a future petition for modification from either party. See Selinger, 351 Ill. App. 3d at 618.

Maintenance in gross is an exception to the rule that maintenance awards are modifiable unless the parties agree otherwise. See In re Marriage of Freeman, 106 Ill. 2d 290, 295 (1985). Steven argues that this court should preserve the trial court's attempt to make its maintenance award nonmodifiable, by interpreting the court's order as establishing either maintenance in gross or "something 'in between' periodic maintenance and maintenance in gross." When entering a judgment

of dissolution, pursuant to section 504(a) of the Act (750 ILCS 5/504(a) (West 2004)) a trial court may award maintenance in gross, an award "in the nature of a property settlement" of a " 'nonmodifiable sum certain' " to be paid regardless of changes in circumstances. Michaelson v. Michaelson, 359 Ill. App. 3d 706, 712 (2005), quoting Freeman, 106 Ill. 2d at 298. An award of maintenance in gross "is appropriate only in exceptional circumstances"; normally, periodic payments are the preferred form of maintenance. Lamp v. Lamp, 81 Ill. 2d 364, 374 (1980). Steven cites no authority for the novel proposition that a court may, years after a dissolution and its accompanying property redistribution, sua sponte transmute an agreed award of periodic maintenance into maintenance in gross. Section 510 of the Act, which governs the modification of maintenance and child support awards, contains no provisions permitting modification of a periodic maintenance award in this fashion. See 750 ILCS 5/510 (West 2004). There is even less support for creating some new form of maintenance "in between" periodic maintenance and maintenance in gross. The dissolution of marriage is entirely statutory in origin and nature, and courts in dissolution cases must exercise their powers within the limits of the Act. In re Marriage of Rhodes, 326 Ill. App. 3d 386, 389 (2001). Accordingly, we find that the trial court exceeded its authority in purporting to make its award of maintenance nonmodifiable.

Even if the trial court had not exceeded its statutory authority in pronouncing its maintenance award nonmodifiable, it would have abused its discretion in doing so. "[T]he optimal goal of maintenance is for the dependent former spouse to become financially independent." Connors, 303 Ill. App. 3d at 229. However, this goal "must be balanced against a realistic appraisal of the likelihood the spouse will be able to support herself in some reasonable approximation of the standard of living established during the marriage." In re Marriage of Cheger, 213 Ill. App. 3d 371, 378

(1991). "Limited maintenance is appropriate only where the spouse is employable at an income that would provide the approximate standard of living enjoyed during the marriage." Selinger, 351 Ill. App. 3d at 615. Where, as here, there was no evidence suggesting that Judy, a dependent former spouse, would be able to earn an income comparable to the standard of living during the marriage anytime in the near future, the trial court abused its discretion in ordering that maintenance must terminate after 36 months without the possibility of extension. See Selinger, 351 Ill. App. 3d at 619 (abuse of discretion to limit term of maintenance; wife who was registered nurse could never approach marital standard of living, and executive husband who had benefitted from wife's support during lengthy marriage had rising income and could afford maintenance); In re Marriage of Rubinstein, 145 Ill. App. 3d 31, 40 (1986) ("Illinois courts give consideration to a more permanent award of maintenance to wives who have undertaken to have children, raise and support the family, and who have lost or been substantially impaired in maintaining their skills for continued employment during the years when the husband was getting his education and becoming established"). Accordingly, on remand, without an agreement, the trial court may not make the award of maintenance nonmodifiable.

## II. Petition for Contribution

We turn now to the issues raised in connection with the trial court's dismissal of Judy's petition for contribution to attorney fees. The trial court dismissed the contribution petition as untimely filed under the rule of In re Marriage of Konchar, 312 Ill. App. 3d 441 (2000). Judy asks that we now revisit our decision in Konchar. In that case we examined the impact of the recently-enacted section 503(j) of the Act (750 ILCS 5/503(j) (West 1998)) on section 508(a) of the Act (750 ILCS 5/508(a) (West 1998)), which had previously governed petitions for contribution to attorney

fees, but which was amended to provide that contribution should be awarded "in accordance with subsection (j) of Section 503." (Emphasis added.) The question we decided in Konchar, and the one we revisit today, is what the legislature intended by the phrase "in accordance with."

The relevant portion of section 503(j) states:

"After proofs have closed in the final hearing on all other issues between the parties (or in conjunction with the final hearing, if all parties so stipulate) and before judgment is entered, a party's petition for contribution to fees and costs incurred in the proceeding shall be heard and decided, in accordance with the following provisions:

(1) A petition for contribution, if not filed before the final hearing on other issues between the parties, shall be filed no later than 30 days after the closing of proofs in the final hearing or within such other period as the court orders.

(2) Any award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." 750 ILCS 5/503(j) (West 1998).

In Konchar, we interpreted the language in section 508(a), that contribution should be awarded "in accordance with" section 503(j), to mean that the time deadlines contained in section 503(j) apply to a petition for attorney fees incurred in postdecree proceedings, and therefore a petition for contribution must be filed before the date of judgment. Konchar, 312 Ill. App. 3d at 443-44. We affirmed the trial court's dismissal of the contribution petition in that case because, although it had been filed within 30 days after the closing of the proofs, it was not filed before the judgment was entered. Konchar, 312 Ill. App. 3d at 444.

Since Konchar was issued, other districts of the Illinois Appellate Court have considered the same question with differing results. In In re Marriage of Carr, 323 Ill. App. 3d 481 (2001), the third division of the First District was presented with the issue of whether the appellate court had jurisdiction over an appeal from a postdecree modification of child support. The order modifying child support had been entered on April 28, 1999, and the trial court had granted the husband's motion to reconsider the judgment on August 27, 1999. The wife had filed a petition for contribution to attorney fees on August 16, 1999, but the trial court did not rule on that petition until March 9, 2000. Thereafter, the wife appealed the trial court's orders of April 28, 1999, and August 27, 1999. The issue was whether the appeal was timely filed. The appellate court held that the August 27, 1999, order, which ruled on the motion for reconsideration, disposed of the only matter raised by the husband's petition to set child support and the petition for contribution to postdecree fees was a separate proceeding that did not toll the time for filing a notice of appeal. Carr, 323 Ill. App. 3d at 485.

In a special concurrence, one judge wrote that he would have reached the same result on the basis of Konchar, as the petition for contribution was filed after April 28, 1999 (which he viewed as the date of the final judgment on the postdecree petition), and therefore was untimely--so the March 9, 2000, order relating to contribution was ineffective. Carr, 323 Ill. App. 3d at 487 (Cerda, J., specially concurring). The majority, however, rejected this interpretation, commenting that it did "not necessarily agree with" Konchar's conclusion that the time deadlines of section 503(j) of the Act apply to postdecree proceedings, and distinguishing Konchar on the ground that it did not discuss jurisdiction. Carr, 323 Ill. App. 3d at 485. Thus, the court suggested a distinction in the treatment

of petitions for contribution toward attorney fees, between those in proceedings relating to the initial entry of the judgment of dissolution and those in postdecree proceedings.

A separate division of the First District Appellate Court took a different view in In re Marriage of Lindsey-Robinson, 331 Ill. App. 3d 261 (2002), due to the procedural posture of the case. In that case, the wife filed a petition for attorney fees after the trial court had entered a judgment for dissolution of marriage. The trial court granted her petition despite its untimeliness, stating:

> " 'The statute is extremely clear this hearing should have been done prior to my entering the judgment.
>
> *** I will hold that any objection is waived, since nobody objected to it.' " (Emphasis omitted.) Lindsey-Robinson, 331 Ill. App. 3d at 268.

On appeal, the husband attacked the trial court's award of fees, arguing that the award was improper under section 503(j) of the Act because the petition for contribution was not filed before the entry of judgment. The appellate court agreed that the petition was untimely, citing Konchar. Lindsey-Robinson, 331 Ill. App. 3d at 268. Lindsey-Robinson has no application to postdecree cases, however, as it arose from the predecree proceedings. Thus, although Lindsey-Robinson is a slightly more recent case, Carr remains the only statement of the First District on the issue of contribution petitions for attorney fees in postdecree cases.

The Third District adopted a position directly contrary to Konchar in Macaluso v. Macaluso, 334 Ill. App. 3d 1043 (2002), a case involving a contribution petition for attorney fees incurred in postdecree proceedings. The contribution petition was filed after the final decision on the postdecree issue was entered, and the trial court dismissed the petition as untimely under Konchar. The appellate

court reversed. Focusing on the reference in section 503(j) of the Act to a "final hearing on all <u>other</u> issues between the parties" (emphasis added) (750 ILCS 5/503(j) (West 2000)), the court held that this language referred to the bifurcated hearing required in predecree proceedings, indicating that the timing requirement of section 503(j) was limited to such proceedings. <u>Macaluso</u>, 334 Ill. App. 3d at 1047. The court concluded that, contrary to <u>Konchar</u>, section 503(j) did not impose a timing requirement for contribution petitions in postdecree cases. "We hold that so long as the trial court otherwise has jurisdiction over the case, either party may petition for contribution toward attorney fees '[a]t the conclusion of the case.' " <u>Macaluso</u>, 334 Ill. App. 3d at 1047, quoting 750 ILCS 5/508(a) (West 2000).

The most recent case to touch on issues related to <u>Konchar</u> is this court's decision in <u>In re Marriage of Berto</u>, 344 Ill. App. 3d 705 (2003), in which we found that <u>Konchar</u> was inapplicable to the facts of the case. In that case, the petitioner sought to have the respondent pay the fees she incurred to enforce a previous order, pursuant to subsection (b) of section 508 of the Act (750 ILCS 5/508(b) (West 2000)). On the date it entered an order resolving the enforcement proceeding, the trial court specifically granted the petitioner additional time to file a fee petition, and the petitioner did so within the time set. The respondent then filed a motion to dismiss the fee petition, citing <u>Konchar</u>. Relying on <u>Konchar</u>, the trial court held that it had no jurisdiction to hear the fee petition because it had been filed after the trial court ruled on the underlying enforcement proceeding. <u>Berto</u>, 344 Ill. App. 3d at 709-10.

We reversed, finding that <u>Konchar</u> was inapplicable because the trial court expressly granted the petitioner additional time to file the fee petition. We noted that section 503(j)(1) of the Act permits the court to extend the time to file fee petitions:

"(1) A petition for contribution, if not filed before the final hearing on other issues between the parties, shall be filed no later than 30 days after the closing of proofs in the final hearing <u>or within such other period as the court orders</u>." (Emphasis added.) 750 ILCS 5/503(j)(1) (West 2000).

The petitioner filed her fee petition within the time granted by the trial court, and thus, the trial court erred in dismissing the petition for lack of jurisdiction.

Judy asks that we revisit our decision in <u>Konchar</u> in light of the above decisions. After careful consideration, we find it appropriate to revisit the question of how the legislature intended sections 508 and 503(j) of the Act to interact in the wake of the 1997 amendments to the Act. As always, we begin our inquiry into legislative intent by looking to the statutes themselves. The primary rule of statutory construction requires that the court ascertain and give effect to the legislative intent. <u>In re Marriage of Takata</u>, 304 Ill. App. 3d 85, 94 (1999). In order to determine the legislative intent, the court should look to the language of the statute and give the words and phrases their plain and ordinary meaning. <u>Takata</u>, 304 Ill. App. 3d at 94. In doing so, the court must consider all of the parts of the statute together and give every word or phrase some reasonable meaning. <u>Takata</u>, 304 Ill. App. 3d at 94.

Section 508 of the Act (750 ILCS 5/508 (West 2004)) is the section most directly concerned with the recovery of attorney fees by one party against another within a dissolution action, and was the section of the Act that exclusively governed this area prior to the 1997 enactment of section 503(j) and the related amendment of section 508(a) (the 1997 amendments). <u>Konchar</u>, 312 Ill. App. 3d at 442, citing Pub. Act 89--712, §5, eff. June 1, 1997; see also <u>In re Marriage of Brackett</u>, 309

Ill. App. 3d 329, 344 (1999). Prior to the 1997 amendments, section 508(a) permitted the determination and allocation of reasonable attorney fees in somewhat confusing language, as follows:

"The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own costs and attorney's fees and for the costs and attorney's fees necessarily incurred or, for the purpose of enabling a party lacking sufficient financial resources to obtain or retain legal representation, expected to be incurred by any party, which award shall be made in connection with the following: [five broad categories of dissolution-related legal proceedings for which allocation of attorney fees may be sought]." 750 ILCS 5/508(a) (West 1996).

As modified by the 1997 amendments, section 508(a) now states as follows:

"The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees. Interim attorney's fees and costs may be awarded from the opposing party, in accordance with subsection (c--1) of Section 501. At the conclusion of the case, contribution to attorney's fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503. Fees and costs may be awarded to counsel from a former client in accordance with subsection (c) of this Section. Awards may be made in connection with the following: [categories of dissolution-related proceedings for which fees may be sought, including the original five categories and adding two new ones].

The court may order that the award of attorney's fees and costs (including an interim or contribution award) shall be paid directly to the attorney, who may enforce the order in his

or her name, or that it shall be paid to the appropriate party. Judgment may be entered and enforcement had accordingly. Except as otherwise provided in subdivision (e)(1) of this Section, subsection (c) of this Section is exclusive as to the right of any counsel (or former counsel) of record to petition a court for an award and judgment for final fees and costs during the pendency of a proceeding under this Act." 750 ILCS 5/508(a) (West 2004).

The 1997 amendments also toughened the language of subsection (b), which mandates payment of attorney fees and costs incurred to enforce an order where the failure to comply with the order was without compelling cause or justification, and significantly expanded subsection (c), establishing procedures to govern proceedings to recover fees brought by an attorney against his client. Compare 750 ILCS 5/508(b), (c) (West 1996) with 750 ILCS 5/508(b), (c) (West 2004). The 1997 amendments thus made a variety of changes to the structure of the Act.

With reference to section 508(a) of the Act specifically, the amendments served several purposes. For instance, the 1997 amendments clarified the manner in which fees could be awarded--on an interim basis or at the end of the particular proceeding. The amendments set a time when the issue of the final allocation of attorney fees may be raised: "[a]t the conclusion of the case." 750 ILCS 5/508(a) (West 2004). Finally, the amendments also identified other provisions of the Act to be considered in conjunction with the award of interim fees (section 501(c--1)) and final fees (section 503(j)). 750 ILCS 5/508(a) (West 2004).

Considering all of the changes to section 508(a) together, we believe that the new reference to section 503(j) was intended not to impose an additional timing requirement for contribution petitions, but to codify other factors for courts to consider in awarding final fees. Prior to the 1997 amendments, the only factor that the statute expressly required a court to consider in deciding

contribution issues was "the financial resources of the parties." 750 ILCS 5/508(a) (West 1996).

Nevertheless, even before the 1997 amendments, courts actually considered other factors as well,

including "the allocation of assets and liabilities, the award of maintenance, and the relative earning

abilities of the parties when determining whether one party should contribute toward the payment of

the other party's attorney fees." In re Marriage of McGuire, 305 Ill. App. 3d 474, 478 (1999) (citing

cases). The amended section 508(a)'s reference to section 503(j), which directs courts to consider

the factors listed in sections 503 and 504 of the Act when awarding attorney fees, makes the use of

these factors explicit. See McGuire, 305 Ill. App. 3d at 479 (the 1997 amendments "merely codifie[d]

the criteria that trial courts and courts of review have always considered in determining whether to

award attorney fees and in what proportion"); 750 ILCS 5/503(j)(2) (West 2004). Thus, we conclude

that section 508(a)'s mandate that fees and costs be awarded from the opposing party "in accordance

with" section 503(j) must be read to mean that a court must take the factors delineated in section

503(j)(2) into account in deciding contribution petitions, not to mean that the timing requirements

of section 503(j) govern all awards of attorney fees.

Our reading of section 508(a) is supported by the role of sections 508 and 503 in the overall

statutory scheme of the Act. As we have noted, section 508 governs attorney fees and costs in

proceedings related to dissolution or its aftermath. Section 508 makes no distinction between

predecree and postdecree proceedings; in either proceeding, attorney fees are to be determined and

awarded "[a]t the conclusion of the case." 750 ILCS 5/508(a) (West 2004).

By contrast, section 503 of the Act (750 ILCS 5/503 (West 2004)) is primarily concerned

with the allocation of marital property, a process that takes place at the time the judgment of

dissolution is entered. Entitled "Disposition of property," section 503 contains a variety of

subsections relating to the equitable apportionment of the marital estate between the parties to a dissolution action. Only one of these subsections, subsection (j), deals with the allocation of attorney fees related to a dissolution proceeding. 750 ILCS 5/503(j) (West 2004). The overarching principle embodied in section 503 is that of equitable distribution: ensuring that marital property is fairly distributed between the parties, taking into account a variety of factors including a dozen factors listed in the statute. 750 ILCS 5/503 (West 2004). To ensure that equitable distribution is achieved, courts consider the issue of property distribution not in isolation but together with issues of maintenance, child support, insurance, and any other issue affecting the financial future of the parties and any children they have. In re Marriage of Leopando, 96 Ill. 2d 114, 119 (1983) ("it is difficult to conceive of a situation in which the issues are more interrelated than those involved in a dissolution proceeding" and thus all the issues should be resolved by the trial court at one time). These interrelated issues must be resolved together, either through settlement or trial, when the initial judgment for dissolution of marriage is entered. Leopando, 96 Ill. 2d at 119.

In predecree proceedings, the apportionment of attorney fees is viewed as another aspect of financial allocation that a trial court must factor into the total picture at the time of dissolution. In re Marriage of Tomei, 253 Ill. App. 3d 663, 666 (1993) (the allocation of attorney fees is "integrally related to decisions regarding the financial resources of each of the parties, [and] a disposition of their allocation should be made before the reviewing court can properly assess the trial court's decisions regarding maintenance, child support, or division of property"); see also In re Marriage of Derning, 117 Ill. App. 3d 620, 626 (1983) ("the allocation of attorney fees [prior to] judgment is dependent upon and integrally related to decisions regarding property, maintenance and child support"). The language of section 503(j) requires that contribution petitions be decided after proofs have closed in

the final hearing, but before judgment is entered--in other words, as soon as the final amount of fees can be calculated, but while the trial court can still include the fees in its decision on all of the financial matters that have arisen. Section 503(j) is clearly directed toward ensuring that all financial allocations are determined at the same time that attorney fees for predecree proceedings are sought. The timing requirements contained in section 503(j) thus are appropriate in the context of predecree proceedings.

These same policy considerations have less force once the marital estate has been distributed and the initial allocation of financial assets has occurred. See In re Custody of Purdy, 112 Ill. 2d 1, 4-5 (1986) (Leopando's directive to decide all dissolution-related issues together does not apply to postdecree proceedings). Postdecree disputes typically involve attempts to modify or enforce the parties' original obligations under the judgment of dissolution, rather than the wholesale redistribution of marital property. The award of attorney fees in connection with these proceedings thus does not require the same degree of weighing that must occur in awarding fees upon the parties' initial dissolution, in which the allocation of fees must be balanced with the allocation of other marital assets and obligations. See Carr, 323 Ill. App. 3d at 485 ("Attorney fees in postdecree cases are simply not directly related to the central issues in the equitable distribution of property as they are in cases at the time of a judgment of dissolution"). Further, we agree with the holding of Macaluso that the language of section 503(j) indicates that the timing requirements are intended to apply only to predecree proceedings. Macaluso, 334 Ill. App. 3d at 1047. Accordingly, the imposition of section 503(j)'s time limits on the award of attorney fees in postdecree proceedings is not warranted.

To the extent that one of our earlier cases, In re Marriage of Piccione, 158 Ill. App. 3d 955 (1987), contains language suggesting a contrary approach (to the effect that attorney fees are equally

"central" in predecree and postdecree proceedings), we reject that language as not giving proper weight to the distinction drawn by the supreme court in Purdy. However, we continue to hew to the basic holding of Piccione and subsequent cases, which was that when an order resolves fewer than all of the claims pending in a postdecree proceeding, the order is not independently appealable unless it contains a written finding of appealability pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)). See In re Marriage of Duggan, No. 2--06--0061, slip op. at 22-26 (October 16, 2007) (discussing appellate jurisdiction in Piccione and subsequent cases); see also In re Marriage of Gutman, No. 2--06--0213 (October 16, 2007) (discussing the special case of appellate jurisdiction in postdecree cases involving civil contempt proceedings). These cases do not govern our analysis here, because no postdecree issues remain pending before the trial court and therefore this case presents no issue of appellate jurisdiction.

Our decision today is supported by practical considerations as well. Prior to the entry of judgment in a case, attorneys face difficulties in preparing fee petitions that are sufficiently detailed, because fees typically continue to accrue throughout the final hearing or settlement negotiations that culminate in the judgment. Under Konchar, to preserve clients' rights to bring fee petitions later, attorneys must submit initial requests for fees long before the resolution of the issues raised by the postdecree petitions, and then prepare later, more detailed supplements immediately before the final hearings, a practice that results in the needless expenditure of attorneys' labor and clients' funds. Moreover, the need for a petition for attorney fees may depend in part on the trial court's resolution of the postdecree request for relief. For instance, parties who receive financial relief on the merits may choose to forgo filing petitions, knowing that their financial situations are no longer likely to justify awards of contribution. A litigant whose postdecree petition has been deemed frivolous by

the trial court may also choose to forgo seeking contribution, knowing that it is unlikely to be successful. Under the current practice, however, parties cannot wait until the issues are resolved before deciding whether to seek contribution; if they want to preserve the right to seek it at all, they must file petitions in advance. This creates an unnecessary drain on the resources of the courts and the parties.

In predecree cases, the policy considerations set out in Leopando, Tomei, and Derning mandate that parties nevertheless submit their contribution petitions prior to the entry of judgment, despite these difficulties. See Leopando, 96 Ill. 2d at 119; Tomei, 253 Ill. App. 3d at 666; Derning, 117 Ill. App. 3d at 626. In postdecree cases, however, there is no similar reason to require that contribution petitions be filed before the final resolution of the postdecree issues. In these circumstances, the goal of equitable allocation between the parties is best served by requiring parties to file any petitions for contribution promptly after the issues raised in the postdecree petition have been decided.

In sum, we reconsider the holding of Konchar and hold that the time limits of section 503(j)(1) of the Act do not apply to petitions for contribution to attorney fees in postdecree proceedings. Rather, in conformity with the language of section 508(a) of the Act, such petitions are timely if filed "at the conclusion of the case," that is, within 30 days after the date on which judgment is entered. In this case, Judy's petition for contribution was filed within that period, and so her petition was timely and must be heard by the trial court. Because we are remanding to permit the trial court to hear and decide the contribution petition, we do not reach the other issues that were raised on appeal regarding the dismissal of that petition.

CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court of Lake County and remand for further proceedings consistent with this decision.

Reversed and remanded.

GROMETER, P.J., and CALLUM, J., concur.